**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 13-74303 (AST) |
| Personal Communications Devices, LLC, *et al.*, | Chapter 11 |
| Debtors. | (Jointly Administered) |
| Devices Liquidation Trust, Plaintiff, | |
| v. | |
| KMT Wireless, LLC dba CynergyHitech, | Adv. No. 15-08237 (AST) |
| Defendant. | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT DISMISSING COMPLAINT

DAVIDOFF HUTCHER & CITRON LLP
605 Third Avenue
New York, New York 10158
(212) 557-7200

Of Counsel
David H. Wander, Esq.
Taylor D. Kopelan, Esq.

## TABLE OF CONTENTS

Page No.

PROCEDURAL HISTORY .................................................................................................. 4

STATEMENT OF FACTS ................................................................................................... 4

    PCD's Chapter 11 Filing .......................................................................................... 4

    PCD's Business .......................................................................................................... 5

    Repair Service Vendors: KMT and Shine ............................................................... 6

    Debtor's APA With Quality One .............................................................................. 7

    Customer Programs Motion ...................................................................................... 8

    The Interim Order ................................................................................................... 10

    The Final Order ....................................................................................................... 11

    Debtor's Sale of Assets to Quality One ................................................................. 12

    Confirmation of Debtor's Liquidating Plan .......................................................... 12

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT .................................................................................................................... 13

POINT I ............................................................................................................................ 13

THE COURT WOULD HAVE APPROVED THE CUSTOMER PROGRAMS MOTION EVEN
IF IT INCLUDED PAYMENT OF THE ALLEGED PREFERENTIAL TRANSFERS TO THE
REPAIR SERVICE VENDORS ....................................................................................... 13

POINT II ........................................................................................................................... 22

PLAINTIFF CANNOT SATISFY § 547(b)(5) BECAUSE A CHAPTER 7 TRUSTEE WOULD
HAVE PAID KMT IN FULL, AS A CRITICAL VENDOR, IN ORDER TO CONSUMMATE
THE SALE WITH QUALITY ONE ................................................................................ 22

CONCLUSION ................................................................................................................. 25

i

# TABLE OF AUTHORITIES

## Cases

*AFA Investment Inc., v. Trade Source, Inc. (In re AFA Investment Inc.)*
   538 BR 237, 244 (Bankr. D. Del. 2015) ........................................................................... 6, 18, 25

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ...................................................... 16

*Binder v. Long Island Lighting Co.*
   933 F.2d 187, 191 (2d Cir. 1991) ............................................................................................. 17

*Brady v. Town of Colchester*
   863 F.2d 205, 210 (2d Cir. 1988) ............................................................................................. 16

*Burrell v. City Univ. of New York,*
   894 F.Supp. 750, 757 (S.D.N.Y. 1995) .................................................................................... 16

*Celotex Corp. v. Catrett*
   477 U.S. 317, 322 n.4, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .............................................. 16

*In re A&T Trailer, Inc.*
   53 B.R. 144, 147 (Bankr. D.Wyo. 1985) .................................................................................. 27

*In re AFA Inv. Inc., 538 BR 237, 244 (Bankr. D. Del. 2015)* ..................................................... 18

*In re Aloha Airlines, Inc.*
   No. 08-00337 LK, 2008 WL 5758797 (Bankr. D. Haw. Nov. 26, 2008) ................................... 27

*In re Ampal-Am. Israel Corp.*
   No. 12-13689 (SMB), 2015 WL 5176395 (Bankr. S.D.N.Y. Sept. 2, 2015) ............................. 27

*In re Fultonville Metal Products Co.*
   330 B.R. 305, 315 (Bankr. M.D. Fla. 2005) ......................................................... 18, 21, 22, 23

*In re Gwen*
   No. 15-02111 JAK, (C.D. Ca. Nov. 5, 2015) ........................................................................... 27

*In re Kern, 567 B.R. 17, 26 (Bankr. E.D.N.Y. 2017)* ................................................................ 16

*In re Kiwi Int'l Air Lines, Inc.*
   344 F.3d 311, 319 (3d Cir. 2003) ............................................................................................. 26

*In re Lason, Inc.*
   300 B.R. 227, 233 (Bankr. D. Del. 2003) ................................................................................. 27

*In re Middle Bay Golfers' Ass'n, Inc.*
  No. 8-13-70361-DTE, 2013 WL 6355598 (Bankr. E.D.N.Y. Dec. 5, 2013)............................. 27

*In re Middle Bay Golfers' Ass'n, Inc.*
  No. 8-13-70361-DTE, 2013 WL 6355598 (Bankr. E.D.N.Y. Dec. 5, 2013); ........................... 27

*In re Oak Rock Fin., LLC*
  527 B.R. 105, 113 (Bankr. E.D.N.Y. 2015) .............................................................. 17

*In re Premier Golf Properties, LP*
  564 B.R. 710 (Bankr. S.D. Cal. 2016) ...................................................................... 27

*In re Quarter Moon Livestock Co.*
  116 B.R. 775 (Bankr. D. Idaho 1990) ...................................................................... 27

*In re Roblin Indus., Inc.*
  78 F.3d 30, 34 (2d Cir. 1996) ................................................................................. 26

*In re Siskin*
  No. 02-10373 SMB, 2011 WL 4899868 (Bankr. S.D.N.Y. Oct. 13, 2011) ................................. 27

*In re Sofer*
  519 B.R. 28, 32 (Bankr. E.D.N.Y. 2014) .................................................................. 26

*In re Spearman Food Distributors, Inc.*
  No. 10-10409 MR, 2011 WL 4595274 (W.D. N.C. Sept. 30, 2011) ......................................... 27

*In re TransCare Corp*
  552 B.R. 69 (Bankr. S.D.N.Y. 2016) ....................................................................... 27

*In re Waring*
  491 B.R. 324, 330–32 (Bankr. E.D.N.Y. 2013) ......................................................... 26

*In re Zenith Indus. Corp.*
  319 B.R. 810, 817 (D. Del. 2005) .................................................................... *Passim*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
  475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)............................................. 16

*Pereira v. Cogan*
  267 B.R. 500, 506 (S.D.N.Y. 2001) ........................................................................ 17

*Tomka v. Seiler Corp.*
  66 F.3d 1295, 1304 (2d Cir. 1995) ......................................................................... 16

## PRELIMINARY STATEMENT

Defendant KMT Wireless, LLC d/b/a CynergyHitech submits this memorandum of law in support of its motion for summary judgment dismissing the complaint in this adversary proceeding to recover alleged preferential transfers pursuant to § 547 of the Bankruptcy Code, based upon Defendant's "critical vendor" defense.

While the critical vendor defense to a preference complaint appears to be a case of first impression in the Second Circuit, other courts have addressed this issue, in particular the Delaware bankruptcy court.  One thing these decisions make clear is that there is no bright-line test; the critical vendor defense to a preference complaint is to be determined on a case by case basis.

Like determining the intent of parties to an ambiguous contract, the critical vendor defense requires the court to engage in an exercise of hindsight; to review the record and determine how the various interested parties (e.g. a secured lender or the U.S. Trustee) and, most importantly, the court itself would have responded to a critical vendor motion that included a request for payment of preferential transfers, assuming such transfers had not been made prepetition.  If such determination would be too speculative, then the critical vendor defense will fail, at least on a dispositive motion. However, if the record shows that the preference payments would have been approved had they been included in the critical vendor motion, then the critical vendor defense should preclude any preference claim.

For example, in the seminal case of <u>In re Zenith</u>, 319 B.R. 810 (Bankr. D. Del. 2005), Judge Walsh of the Delaware Bankruptcy Court found "[i]t is speculation to conclude that no party in interest, including the pre-petition secured lender in this case and the U.S. Trustee,

would have objected or that the Court would have granted a motion that had not been made," i.e. if the preference payment had not been made and was included in a motion requesting authorization for payment to a critical vendor. Id. at 818. On the other hand, in a more recent case, In re AFA Investment Inc., v. Trade Source, Inc., 538 B.R. 237, 244 (Bankr. D. Del. 2015), Judge Walrath of the same court determined that no one would have objected to payment of the preferential transfer at issue if it had been included in the debtor's critical vendor motion, stating "the Court finds that unlike in *Zenith,* the inclusion of the alleged preference payment in the motion would not have been likely to draw an objection or result in the Court's refusal to enter the Order."

The undisputed record in the present case makes this Court's determination about the application of the critical vendor defense relatively easy. Here, the Defendant's motion for summary judgment relies, for the most part, on sworn statements by the Debtor's former Chief Financial Officer, Raymond Kunzmann, as well as the Debtor's representations to the Court in the Customer Programs Motion.

In addition, three affidavits filed in support of Defendant's motion for summary judgment, along with Mr. Kunzmann's deposition testimony taken in this adversary proceeding, provide further support for Defendant's contention that the Court would have approved the Customer Programs Motion even if it included any preferential transfers to KMT and the other Repair Service Vendor.  Two of these affidavits are by former employees of the Debtor, who have firsthand knowledge about KMT and its relationship with PCD, and the third affidavit is by KMT's principal.  Together with Mr. Kunzmann's deposition testimony, they drive home the key points set forth in the Customer Programs Motion and make it crystal clear that no party in interest would have objected -- and the Court would have approved -- the Customer Programs

Motion -- if the alleged preferential payments had not been made and, instead, were included in that motion.

What is truly unique about the Customer Programs Motion is that there was no cap on the payments the Debtor could make to the Repair Service Vendors under the Final Order entered by the Court.  Most significantly, the $1 million cap on payments to the Repair Service Vendors under the Interim Order was removed by the Debtor in the Final Order. The Repair Service Vendors, and KMT in particular, were that important to PCD's estate!

KMT was truly indispensable to the Debtor's estate, even more so than the only other Repair Service Vendor, Shine Electronics Co., because KMT handled all of PCD's repair work for Verizon, which was by far PCD's largest customer. If KMT was not paid its prepetition claim in full and, as a result, stopped diligently repairing Verizon's phones (of which KMT had almost 20,000 when the Debtor's chapter 11 case was commenced) the Debtor would have incurred penalties from Verizon exceeding $20 million.  Worse still, PCD's sale of substantially all of its assets to Quality One would have been aborted, leaving the Debtor with only its inventory of phones to be liquidated at well below cost. In sum, paying the Repair Service Vendors in full, including any voidable preferential transfers probably saved the Debtor's estate more than $100 million.

Because KMT was so critical to preserving the enterprise value of PCD's business, KMT would have been paid 100% of its prepetition invoices, including any preferential transfers, even in a hypothetical chapter 7 case.  Any trustee would have sought authorization to operate PCD's business, pursuant to § 721 of the Bankruptcy Code, for the two months needed in order to consummate the sale of assets to Quality One and, undoubtedly, such trustee would have also filed a motion similar to the Customer Programs Motion.  Because KMT would, therefore,

3

receive a 100% payment in a hypothetical chapter 7 case, Plaintiff cannot satisfy one of the necessary elements of the preference statute, subsection 547(b)(5).

For all of the foregoing reasons, the Court should grant Defendant's motion for summary judgment dismissing the complaint in this adversary proceeding.

## PROCEDURAL HISTORY

On August 18, 2015, Devices Liquidation Trust filed a complaint against KMT asserting five (5) causes of action, including a claim under § 547 of the Bankruptcy Code[1] to avoid alleged preferential transfers totaling $3,824,194.73.[2]

On November 16, 2015, KMT filed an Answer, denying any liability and asserting various affirmative defenses, including a "critical vendor" defense. ECF No. 12.

Pursuant to the Court's Amended Adversary Pretrial Order dated August 18, 2017, Defendant was authorized to file a motion for summary judgment dismissing the complaint, based upon its critical vendor defense, on or before August 30, 2017. ECF No. 29. Accordingly, Defendant hereby files its motion for summary judgment.

## STATEMENT OF FACTS

### PCD's Chapter 11 Filing

On August 19, 2013 (the "Petition Date"), Personal Communications Devices, LLC and Personal Communications Devices Holdings, LLC (together "PCD" or the "Debtor"), filed a voluntary petition for relief under chapter 11 of title 11 United States Code (the "Bankruptcy

---

[1] The Complaint also included claims under §§ 548 and 549 but, upon information and belief, Plaintiff is not pursuing these other causes of action.

[2] After filing the Complaint, Plaintiff acknowledged that Defendant's exposure for preferential transfer liability should be reduced by at least $3,208,626.46, based upon the ordinary course of business defense and the new value defense, for a net claim of $615,568.27 before considering other defenses raised by Defendant including, without limitation, Defendant's critical vendor status. *Declaration of Devices Liquidation Trust dated May 10, 2017 ("Pl. Decl.")* ¶ 3.

4

Code") with the United States Bankruptcy Court for the Eastern District of New York (the "Court"), Case No. 13-74303 (AST).  ECF No. 1.

As of the Petition Date, PCD had secured claims totaling approximately $107,000,000, with a first lien of approximately $35,000,000 held by JPMorgan Chase Bank, N.A ("JP Morgan") and a second lien held by DLJ Investment Partner, L.P ("DLJ Investment") and PineBridge Vantage Capital, L.P. ("PineBridge") and others.  *Declaration of Raymond F. Kunzmann Pursuant to Rule 1007-4 of the Local Rules for the Eastern District of New York in Support of Chapter 11 Petition and Requests. for Relief* ("*Kunzmann Decl.*") ¶¶ 16–18, ECF No. 2.

PCD filed a list of the top thirty (30) unsecured creditors ("List of Top 30 Unsecured Creditors") and their claims aggregated in excess of $225,000,000.  *Kunzmann Decl.* ¶¶ 4, 10. PCD's largest unsecured trade creditor was listed as having a claim of $96,273,931, the next three largest unsecured trade creditors had claims of $27,369,762, $21,420,131, and $18,848,000, respectively, and there were a total of eight unsecured trade claims in excess of one million dollars.  Id. ¶ 20, Schedule 2.

On August 26, 2013, an Official Committee of Unsecured Creditors was formed and, thereafter, the Committee retained bankruptcy counsel. ECF Nos. 54, 77.

**PCD's Business**

PCD sold mobile devices and accessories. *Kunzmann Decl.* ¶ 4. Each wireless device sold by PCD was accompanied by a comprehensive warranty which obligated PCD to provide certain repair services (the "Warranty Repair Services") and the Warranty Repair Services were essential to PCD's business. *Kunzman Decl.* ¶ 61; *Customer Programs Mot.* ¶ 15; *Transcript of deposition of Raymond F. Kunzmann dated May 4, 2017*, ("*Kunzmann Dep.*") at 21:18–22:6;

5

26:23–25; 21:18–22:6.   As of June 30, 2013, PCD had reserves totaling $20,000,000 for Warranty Repair Services. *Kunzman Decl.* ¶ 62; *Customer Programs Mot.* ¶ 17.

PCD also repaired and refurbished wireless devices outside of their warranty period (the "Out-of-Warranty Repairs" and together with the Warranty Repair Services the "Repairs") and the Out-of-Warranty Repairs were also essential to PCD's business. *Customer Programs Mot.* ¶ 16.

In 2012, PCD had revenues totaling $1.6 billion.  Id. ¶ 10.  As of the Petition Date, Verizon was, by far, PCD's most important customer, representing 60% of its business. *Affidavit of Todd Mazza in Support of Defendant's Motion for Summary Judgment* ("*Mazza Aff.*") ¶ 4.

**Repair Service Vendors: KMT and Shine**

KMT and another repair service vendor, Shine Electronics Co., Inc. ("Shine" and together with KMT the "Repair Service Vendors"), performed almost all of the Warranty Repair Services and the Out-of-Warranty Repairs for PCD; at least 97% of them.  *Kunzmann Dep.* 27:7–28:24; *Affidavit of Robert Desio in Support of Defendant's Motion for Summary Judgment Dismissing the Complaint* ("*Desio Aff.*") ¶ 2; *Mazza Aff.* ¶ 8; *Kunzman Decl.* ¶ 62; *Customer Programs Mot.* ¶ 18. As of the Petition Date, PCD owed the Repair Service Vendors approximately $975,000.  *Kunzmann Decl.* ¶ 62; Customer Programs Mot. ¶ 18.

As of the Petition Date, KMT had approximately 18,000 phones and other wireless devices (the "Verizon Units") from Verizon Wireless ("Verizon"), in various stages of repair, and the Verizon Units were valued at approximately $6,200,000. Affidavit of Darin *Mickel In Support of Defendant's Motion for Summary Judgment Dismissing the Complaint* ("*Mickel Aff.*") ¶ 4.  KMT also had possession of more than 1,000,000 items of PCD's parts inventory, which had a value in excess of $2,200,000, for KMT's repair work of the Verizon Units and also for

additional Verizon phones that Verizon was expected to deliver to KMT in the ordinary course of PCD's business (the "Parts Inventory"). *Mickel Aff. ¶ 5.*

Significantly, PCD was obligated to repair and return the Verizon Units within a five day turnaround time ("TAT") and, if PCD failed to meet the TAT on each and every one of the Verizon Units, PCD would incur monetary penalties on the following graduated scale:

| Days late | Penalty |
|-----------|---------|
| 1 | $10 |
| 2 | $20 |
| 3 | $30 |
| 4 | $40 |
| 5 | $50 |
| 6 | $60 |
| 7 | $100 |
| 8 | $115 |
| 9 | $135 |

*Mazza Aff. ¶ 9.* After that, if the TAT was ten days late or more, the penalty increased dramatically, whereby PCD would have to provide Verizon with a new device. *Mazza Aff. ¶ 10.*

**Debtor's APA With Quality One**

At least six months prior to the Petition Date, PCD was experiencing cash flow and liquidity problems and it began seeking a buyer for substantially all of its assets. *Kunzmann Decl. ¶ 32.* On June 24, 2013, after an aggressive effort to shop the company with the aid of investment bankers and other professionals, PCD signed a letter of intent with Quality One for the sale of substantially all of PCD's assets. Id. ¶¶ 32–34.

Between June 24, 2013 and August 19, 2013, PCD and Quality One negotiated the terms of an asset purchase agreement. Id. ¶ 34. A critical part of this negotiating process was an active effort by PCD and Quality One to present to the wireless carriers and device manufacturers the viability of a new business operated by Quality One using PCD's assets. Id. Among other things, representatives of PCD and Quality One met with Verizon to assure it that there would

7

not be any disruption in the supply and servicing of Verizon's product lines if quality One purchased PCD's business. *Mazza Aff.* ¶ 7.

On August 19, 2013, after receiving expressions of support from PCD's carrier customers, PCD and Quality One, together with certain affiliated entities, executed an Asset Purchase Agreement (the "APA") in a deal valued at $200,000,000. *Kunzmann Dep.* 55:20–23. Pursuant to the APA, Quality One agreed to assume certain liabilities of PCD including its warranty repair obligations. *Bidding Procedures and Sale Motion* ("*Sale Motion*") ¶ 12(c), ECF No. 10.

One of the closing conditions was that PCD had to continue its ordinary and usual course of normal day-to-day operations[3] consistent with past practice, and there could not be any material adverse event.[4] See *APA* § 5. Another closing condition was that PCD had to maintain its "Customer Programs" and this included the warranties and guarantees to which the Debtor was contractually obligated. *APA* § 10.1; *Customer Programs Mot.* ¶ 28.

On August 20, 2013, the Debtor filed a motion to set forth the bidding procedures for a sale of the Debtor's assets to Quality One, pursuant to the APA and § 363(b) of the Bankruptcy Code subject to higher and better bids. See *Sale Motion*.

**Customer Programs Motion**

The Debtor also filed a motion, on August 20, 2013, seeking authorization to pay the amounts owed to the Repair Service Vendors. See id. The Debtor sought an interim order

---

[3] The APA defined "Ordinary Course of Business" to mean "the ordinary and usual course of normal day-to-day operations of the Seller's Business consistent with past practice to the extent consistent with the limitations of the Chapter 11 Case." *APA* § 1.1.

[4] Also, the APA defined "Material Adverse Event" to include: "(i) an event or occurrence that results in a material adverse effect on the Business, assets or properties of Seller, taken as a whole, (ii) an event or occurrence that results in a material adverse effect on the value of the Purchased Assets, taken as a whole…" *APA* § 1.1.

8

authorizing payments to the Repair Service Vendors with a $1 million cap (the "Interim Order"), see ECF No. 35, and a final order without any limit on payments ("Final Order"). See ECF No. 101.

The Repair Service Vendors were critical to the Debtor's ability to honor its warranty claims and to refurbish phones returned out of warranty. *Kunzmann Decl.* ¶ 63; *Customer Programs Mot.* ¶ 19. The loss of the Repair Service Vendors would have caused severe disruption to the Debtors' business. *Kunzmann Decl.* ¶ 63; *Customer Programs Mot.* ¶ 19. As of the Petition Date, it would have taken the Debtor in excess of four months to locate, engage and train another vendor to perform the Warranty Repairs and Out-of-Warranty Repairs. *Kunzmann Decl.* ¶ 63; *Customer Programs Mot.* ¶ 19; *Desio Aff.* ¶ 9; *Mazza Aff.* ¶ 14. If PCD failed to pay the Repair Service Vendors the amounts owed as of the Petition Date, they would have suspended or terminated their relationship with PCD. See *Kunzmann Decl.* ¶ 63; *Customer Programs Mot.* ¶ 19; *Mickel Aff.* ¶ 6. KMT was not a large enough business that it could sustain any significant non-payment by PCD. *Kunzmann Dep.* 33:1–34:15; *Customer Programs Mot.* ¶ 19; Mickel Aff. ¶ 6. As of the Petition Date, the cost to PCD of paying the amount owed to KMT was significantly less than the harm that PCD would have suffered by not paying such amount. *Kunzmann Decl.* ¶ 64; *Customer Programs Mot.* ¶ 20. If PCD failed to honor its warranty obligations and perform refurbishment repairs, its relationships with its carrier customers would have been damaged, perhaps irreparably. *Kunzmann Decl.* ¶ 64; *Customer Programs Mot.* ¶ 20; *Kunzmann Dep.* 35:12–25; 38:7–39:6.

It was the Debtor's business judgment that the payment of the prepetition amounts owed to the Repair Service Vendors would result in enhanced creditor recoveries through the preservation of the going concern value of the Debtors' business, thereby maximizing the value

9

of their assets through a sale. *Customer Programs Mot.* ¶ 28.  Permitting the Debtor to make pre-plan payments to KMT and Shine for their pre-petition claims would maximize recoveries for creditors and preserved the going-concern value of the Debtors' enterprise. Id.  Continuing to administer the Customer Programs without interruption during the pendency of the Debtor's chapter 11 case and honoring prepetition commitments to Customers arising thereunder would help preserve the Debtor's valuable relationships with its customers and goodwill, which would inure to the benefit of all the Debtor's creditors and benefit the Debtor's estate when the Debtor completed a sale of its assets.  Id.  ¶ 30.

If the Debtor was unable to continue the Customer Programs post-petition by paying amounts due and owing to the Repair Service Vendors, the Debtor risked harm to its business, at the cost of depressing the value of its assets and ultimately decreasing the return to the Debtor's estate from a sale of its business assets. Id. Paying the Repair Service Vendors the pre-petition amounts owed would avoid immediate and irreparable harm to the Debtor's estates. See id. ¶ 35. There would have been a swift diminution in value of the Debtor's estates if the Repair Service Vendors were not paid the pre-petition amounts owed to them by PCD. See id.; *Kunzmann Dep.* 45:21–46:10; 46:24–48:5.  Had the Debtors advised KMT that it would be subject to liability for voidable preferential transfers, notwithstanding Court approval of the Customer Programs Motion, KMT would have refused to perform further services to the Debtor. *Mickel Aff.* ¶ 5.

**The Interim Order**

On August 21, 2013 the Court held an interim hearing on the Customer Programs Motion (the "Interim Hearing") and it was attended by attorneys for the Debtors, Quality One, JPMorgan, DLJ Investment Partners, PineBridge,  and Al Dimino, Esq. representing the U.S.

Trustee's Office.[5] *Transcript of Hearing dated August 21, 2013 ("Tr. 8/21/13").*

The Debtor requested Court approval to pay up to one million dollars for 21 days, through the date set for a final hearing, *Tr. 8/21/13,* 31:7–8, and no objection to this interim relief was filed or otherwise presented to the Court. Id. 30:19–31:20. Mr. Dimino characterized the proposed million dollar payment as "a reasonable request to continue the business in its normal form and, hopefully, continue the value of … the business." Id. at 30:18–23.

On August 21, 2013, the Court entered the Interim Order which provided, in pertinent part, that "[t]he Debtors are authorized, but not directed" to pay the Repair Service Vendors. ECF No. 35.

**The Final Order**

On September 10, 2013, the Court held a final hearing on the Customer Programs Motion (the "Final Hearing") and it was attended by attorneys for the Debtor, Quality One, JPMorgan, Pinebridge, DLJ Investment Partners, the U.S. Trustee and, in addition, attorneys for the Creditors Committee. *Transcript of Hearing dated September 10, 2013 ("Tr. 9/10/13").* After identifying the Customer Programs Motion, the Debtor's attorney stated:

> Your Honor, again, this was something that was originally presented at the first day hearing. We had adjourned that hearing in case something else had arisen. The objection deadline was September 6th and no objection has been filed, and therefore, we would request approval of the final order going forward.

*TR. 9/10/13* at 15:1–6. The Court then inquired of Mr. Dimino, who stated that the U. S. Trustee had no objection. Id. 15:7–9. The Court then approved the Customer Programs Motion, stating: "All right. The Court will then authorize on a final basis, maintenance of customer programs, et

---

[5] Because PCD promised to pay KMT's pre-petition invoices, as well as any post-petition invoices, KMT did not believe there was any need to retain bankruptcy counsel in connection with the Customer Programs Motion. *Michael Aff. ¶ 7.*

cetera." Id. 15:12–13.

On September 10, 2013, the Court entered the Final Order which provided, in pertinent part, that "[t]he Debtors are authorized, but not directed" to pay the Repair Service Vendors. *Final Order* pp. 1, 2, ECF No. 101. Notably, the Final Order did not have any cap on payments the Debtor could make to the Repair Service Vendors. Id. ¶ 2.

After the Petition Date, KMT provided all of the repair services requested by PCD and PCD paid all of KMT's unpaid prepetition invoices in full. *Mickel Aff. ¶¶ 8–9.*

**Debtor's Sale of Assets to Quality One**

On October 17, 2013, the Court entered an order approving the sale of substantially all of the Debtors' assets to Quality One, pursuant to the APA, and a closing took place the next day. ECF No. 207; *Motion of the Debtors Pursuant to Section 365(d)(4) of the Bankruptcy Code to Extend the Period Within Which the Debtors May Assume Or Reject Certain Unexpired Leases of Non-Residential Real Property ¶ 9, November 15, 2013*, ECF No. 240.

**Confirmation of Debtor's Liquidating Plan**

On April 11, 2014 the Court entered an order confirming the first amended plan of liquidation proposed by the Debtors and the Creditors Committee.[6] ECF No. 413.

**STANDARD OF REVIEW**

This Court, in In re Kern, 567 B.R. 17, 26 (Bankr. E.D.N.Y. 2017), set forth the standard of review for a summary judgment motion:

> Rule 56(c) of the Federal Rules, as incorporated by Bankruptcy Rule 7056(c), provides that summary judgment should be granted to the moving party if the Court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[6] On April 29, 2014 the Court entered a corrected order confirming the plan. ECF No. 421.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.4, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). A movant has the initial burden of establishing the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the movant meets its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). The Second Circuit has repeatedly noted that, "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir. 1988) (citing *Celotex Corp.*, 477 U.S. at 330 n.2, 106 S.Ct. 2548 (Brennan, J., dissenting)); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir. 1995); *Burrell v. City Univ. of New York*, 894 F.Supp. 750, 757 (S.D.N.Y. 1995). "If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate." *Pereira v. Cogan*, 267 B.R. 500, 506 (S.D.N.Y. 2001); *see Burrell*, 894 F.Supp. at 758 (citing *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991)); *see also In re Oak Rock Fin., LLC*, 527 B.R. 105, 113 (Bankr. E.D.N.Y. 2015).

## ARGUMENT

### POINT I

### THE COURT WOULD HAVE APPROVED THE CUSTOMER PROGRAMS MOTION EVEN IF IT INCLUDED PAYMENT OF THE ALLEGED PREFERENTIAL TRANSFERS TO THE REPAIR SERVICE VENDORS

13

Based upon the undisputed record, it is not speculation to conclude that no objections would have been filed and that the Court would have approved the Customer Programs Motion if it included payment of the alleged preferential transfers to the Repair Service Vendors.  The unique facts of this case, together with the Mr. Kunzmann's sworn statements and the Debtor's representations to the Court in connection with the Customer Programs Motion, make this crystal clear.

A critical vendor defense to a preferential transfer claim under § 547 of the Bankruptcy Code requires the Bankruptcy Court to engage in an exercise of hindsight, whereby the record is reviewed to see whether the court can determine if it would have approved payment of the alleged preferential transfers had they not been made during the preference period and, instead, were included in a request for payment pursuant to a critical vendor motion.    See, e.g., In re Zenith Indus. Corp., 319 B.R. 810, 817 (D. Del. 2005) ("It is speculation to conclude that no party in interest, including the pre-petition secured lender in this case and the U.S. Trustee, would have objected or that the Court would have granted a motion that had not been made, i.e., a motion embodying facts different from those set forth in the motion that was approved."); In re Fultonville Metal Products Co., 330 B.R. 305, 315 (Bankr. M.D. Fla. 2005) ("Based on the record, the Court cannot conclude that the Critical Vendor Motion would have been granted if the Debtor had requested authority to pay Howell the sum of $143,655.88 as a favored unsecured claim, instead of only $38,904.36."); In re AFA Inv. Inc., 538 BR 237, 244 (Bankr. D. Del. 2015) ("[T]he Court finds that unlike in Zenith, the inclusion of the alleged preference payment in the motion would not have been likely to draw an objection or result in the Court's refusal to enter the Order.").

Zenith is the seminal case on this issue, which is an issue of first impression in this

circuit. The debtor, in <u>Zenith</u>, filed a critical vendor motion, along with the filing of its chapter 11 petition, "seeking authority to pay prepetition claims of certain vendors that, in Zenith's estimation, were essential to Zenith's on-going business." <u>Zenith</u>, 319 B.R. at 812. Zenith's "essential vendor program" covered approximately 50 vendors and it had a one million dollar cap on payments.[7] <u>Id.</u> at 817. No objection was filed by the U. S. Trustee or the debtor's secured lender and the court entered an order granting the requested relief. <u>Id.</u> at 812, 818.

Two years later, the chapter 11 debtor commenced an adversary proceeding against Longwood Elastomers, Inc. ("<u>Longwood</u>"), one of vendors included in the critical vendor order, seeking to recover $1,317,587 of alleged § 547 preference transfers, specifically including a $506,035 wire transfer made on the eve of the commencement of that case. <u>Id.</u> at 812. After Longwood filed an answer and sent a notice to Zenith requesting to take depositions related to its essential vendor defense, Zenith filed a motion to strike that defense, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. <u>Id.</u> In response, Longwood contended that, through discovery, it could establish, assuming the preferential payments had not been made, that Zenith would have had to pay all of the prepetition monies owed Longwood, including the $506,035 amount, "in order to preserve the enterprise value 'of the Debtor's business in connection with the sale of the Debtor….'" <u>Id.</u> at 817. However, the <u>Zenith</u> court held that it would not be enough for Longwood to show that Zenith would have agreed to include the $506,035 in the critical vendor motion, because "Longwood would still have to prove that the Court [and others] would have approved the motion." <u>Id.</u>

---

[7] In <u>Zenith</u>, the debtor's motion seeking authority to pay prepetition claims of certain vendors stated that the debtor "is seeking the entry of an order authorizing, but not requiring, it to pay, in the reasonable exercise of its business judgment, the pre-petition Date claims of certain essential vendors on the terms described herein in an aggregate amount not to exceed $1,000,000…." The order likewise stated that the debtor "is authorized, but not required, in its sole discretion, to pay the prepetition Essential Vendor Claims, in the aggregate amount of up to $1,000,000 on the terms and conditions described in the Motion." This language, however, was not dispositive of the issue; the <u>Zenith</u> court reviewed the entire record to try and determine how it would have ruled had the preference payments been included in the critical vendor motion.

> Indeed, even if Zenith were to now stipulate with Longwood that Longwood was an essential vendor as contemplated by the essential vendor motion, and that absent the pre-petition payment it would have included the $506,035 in the relief requested, that would not be sufficient.
>
>         *             *             *
>
> It is speculation to conclude that no party in interest, including the pre-petition secured lender in this case and the U.S. Trustee, would have objected or that the Court would have granted a motion that had not been made, i.e., a motion embodying facts different from those set forth in the motion that was approved.

Id.

Focusing on the U.S. Trustee, the <u>Zenith</u> court stated:

> Whether Zenith would have been able to obtain the U.S. Trustee's acquiescence to the Essential Vendor Order if it added $506,035 to the $1,000,000 is problematic. Adding a fifty percent increase to the amount originally sought obviously changes the facts underlying the motion and makes it uncertain that the U.S. Trustee would have taken the same position.

<u>Id.</u> at 818. Next, the court focused on the secured lender:

> Furthermore, how are we to know that the pre-petition secured lender (who consented to the use of cash collateral pursuant to an agreed budget) would not have objected to such a large payment?

<u>Id.</u>  Then the focus was on the court itself:

> And, of course, assuming that the U.S. Trustee and the pre-petition secured lender would not have opposed such a payment to [defendant], how does one prove that the Court, acting within its discretion, would have approved the request?

<u>Id.</u>

Underlying all of this speculation about how the <u>Zenith</u> court and others would have responded if the preferential transfers had they been included in the debtor's critical vendor motion, was the amount of the transfer at issue relative to the claim in that case. The <u>Zenith</u> court stated: "It is important to note the significance of the $506,035 transaction…." <u>Id.</u>

Specifically, the largest trade vendors had "claims ranging from a high of $93,985 to a low of $21,815 … or an average claim of $45,318." Id. Moreover, with a $1 million cap on payments, "the individual amounts going to the … fifty vendors would be very small." Id. Thus, the Zenith court found "[i]t is obvious that adding the $506,035 claim would materially alter the facts upon which the Essential Vendor Order is based." Id.

Accordingly, the Zenith court held that Longwood could not actually predict how the court would have ruled if the preference payment had not been made and the debtor sought to have it paid as part of its critical vendor motion:

> Thus, it is speculation to assume that absent the pre-petition payment of $506,035 the Court would have authorized a payment of that magnitude to one creditor, [defendant]. If the $506,035 preference payment amount had been included in the relief requested by the Debtor, the simple fact is the relief may have been denied, or granted as to vendors other than [defendant].

Id. In granting the debtor's motion to strike Longwood's critical vendor defense, the Zenith court concluded that there was "no conceivable way that Longwood could present evidence to show that" the court would have approved a critical vendor payment of $506,035 to Longwood. Id. at 819.

In a similar case, the court in Fultonville, which cited Zenith, focused on the record and stated:

> [T]he record must show that all of the vendor's prepetition claims would have been paid in full pursuant to the Critical Vendor Order, if the vendor had not received payment of a portion of its claims prior to the filing of the bankruptcy case.

330 B.R. at 314. In Fultonville, the chapter 11 debtor's critical vendor motion requested authorization to pay Howell Electric Motors ("Howell") a specific amount to the penny, $38,904.36, the outstanding balance owed prepetition for supplies and services. Id. at 309. "To

17

support the Critical Vendor Motion, the Debtor alleged that it wished to maintain a 'business as usual' atmosphere during its bankruptcy case…" <u>Id.</u>  In addition, the debtor contended that it "would be unable to maintain an uninterrupted support of quality goods and services to its customers" if it did not pay Howell's prepetition claim. <u>Id.</u>  According to the debtor, without "authority to pay the prepetition claim of Howell, [the debtor's] day-to-day operations will be severely disrupted." <u>Id.</u> at 312.

Eighteen (18) months after the <u>Fultonville</u> court approved the critical vendor motion, the liquidating trustee under the debtor's confirmed plan of liquidation filed an adversary proceeding against Howell, seeking to recover $104,751.52 as preferential transfers. <u>Id.</u>  After filing an answer, Howell filed a motion for summary judgment that included a critical vendor defense under the rubric of the doctrines of equitable estoppel, law of the case, judicial estoppel and res judicata. <u>Id.</u> at 312.

In denying Howell's motion for summary judgment, the <u>Fultonville</u> court noted the importance of the factual record:

> Under certain circumstances, it may be appropriate to release a supplier from potential avoidance claims in connections with its status as a Critical Vendor.  Because the favored treatment is an inherent departure from basic bankruptcy principles, however, <u>the factual record must clearly justify the grant of such a release.</u>

<u>Id.</u> at 313–14 (emphasis added).  Significantly, the critical vendor payment to Howell authorized by the court was $38,904.36, whereas Howell had received a total $101,751.52 within ninety days prior to the bankruptcy filing.  <u>Id.</u> at 315.  Accordingly, If Howell had not received the preference payments and the debtor wanted to pay Howell in full as a critical vendor, it would have requested authority to pay $143,655.88 instead of only $38,904.36 .  <u>Id.</u>  Notably, the debtor specifically stated, in the critical vendor motion, that the "total aggregate amount of the

payment for which the Debtors request authority herein shall not exceed $38,904.36." Id.  Thus, the record did not support the conclusion that the court would have approved a critical vendor payment to Howell that was "more than three times the amount actually requested and authorized." Id.  The Fultonville court concluded:

> Based on the record, the Court cannot conclude that the Critical Vendor Motion would have been granted if the Debtor had requested authority to pay Howell the sum of $143,655.88 as a favored unsecured claim, instead of only $38,904.36 …. The record does not establish that the Court would have approved the favored treatment for an amount that is more than three times the amount actually requested and authorized …. The record does not demonstrate that Howell's Critical Vendor status operates as a complete defense, as a matter of law, to this avoidance action. Further the records does not show that the particular circumstances surrounding the entry of the Critical Vendor Order justify the availability of the defense.

Id. at 315.

Similarly, in In re Phoenix Restaurant Group, Inc., the court denied a preference defendant's motion for summary judgment, based upon a critical vendor defense, because of the specific facts in that case.  Notably, the critical vendor defendant, Proficient Food Company ("Proficient"), was owed nearly $7 million prepetition, but the critical vendor motion limited payments to Proficient to $900,000, a fraction of the amount owed.  No. 301-12036, 2004 WL 3113719 at *19 (Bankr. M.D. Tenn. Dec. 16, 2004), aff'd, 373 B.R. 541 (M.D. Tenn. 2007). As the court noted, "[h]ere, the Critical Vendor Motion and Order did not contemplate the cure of all prepetition defaults." Id.

The record in the present case is unlike any of those cases, as well as any other reported case concerning the application of the critical vendor defense to a § 547 preference claim.

Here, the undisputed record -- especially the Debtor's own sworn statements and representations to the Court -- presents the Court with overwhelming evidence showing that

19

there would be no speculation in concluding that the Court would have approved the Customer Programs Motion if it included all of the preference payments received by the Repair Service Vendors and that none of the interested parties would have objected.

In stark contrast to the record in Zenith, where there was a one million dollar cap on the critical vendor payments to be shared by 50 vendors, in the present case, there were only two critical vendors, KMT and Shine, and there was no cap on the payments they were to receive under the Final Order.

Also, in stark contrast to the record in Zenith,[8] where the largest trade vendor claim was less than $100,000, in the present case, the claim listed for the largest trade vendor was almost $100 million.  Moreover, two other trade vendors were listed as having claims in excess of $20 million and a total of eight trade creditors were listed as being owed more than $1 million. In other words, while the preference payments to the critical vendor at issue in Zenith represented a relatively significant sum, here the Repair Service Vendor's maximum preference exposure represented a relatively insignificant sum.[9]

The relative insignificance of the alleged preferential transfers in the present case, had

---

[8] Similarly, both Phoenix Restaurant Group, 2004 WL 3113719 and Fultonville, 330 B.R. 305, are also easily distinguishable based upon the record before the court in each of those cases.  In Phoenix, the preference defendant did not even receive payment in full of the prepetition amount owed by the debtor; in fact, the payment requested and approved was less than 15% of the critical vendor's prepetition claim, with more than $6 million of the prepetition claim remaining unpaid.  In Fultonville, the debtor requested and received court approval to pay the preference defendant a discrete amount, down to the penny, representing the prepetition amount owed and nothing in the record indicated that the court would approve payment of the preferential transfers, if they had not been paid prepetition, especially considering that they were three times larger than the approved critical vendor payment.  In neither of those cases did the record contain any real showing of irreparable and devastating harm to the debtor's estate if the challenged payments had not been made prepetition and then were not approved by the court as critical vendor payments.

[9] Plaintiff has acknowledged that Defendant's maximum liability for voidable preference transfers is approximately $615,000. See Pl.'s Decl. ¶ 3. It is also worth noting that Plaintiff settled its preference complaint against Shine for $57,000, while the initial demand, before application of Shine's defenses, was $2,133,282.11.  See Order Granting Devices Liquidation Trust's Motion Pursuant to Bankruptcy Code Section 105 and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Entry of an Order Authorizing and Approving the Settlement Agreement, PCD v. Shine, Adv. Pro. No. 15-08063 (AST), ECF No. 36

they been included in the Customer Programs Motion, is highlighted by the Debtor's representations in the motion, as well as the sworn statements by Mr. Kunzmann in the Debtor's first-day declaration as well as in his deposition testimony. As Mr. Kunzmann testified, if KMT did not repair and ship the Verizon Units in a timely manner, PCD would have incurred penalties totaling at least $20,000,000.[10]   *Kunzmann Dep.* 36:10–37:23.   Also, if the Repair Service Vendors were not paid the prepetition amounts owed to them and PCD then failed to honor its warranty obligations and also to perform refurbishment repairs, the results would be devastating to PCD's estate, with the loss of Verizon as a customer and the loss of Quality One as an asset purchaser.  *Kunzmann Dep.* 35:12 –25; 38:7–39:6; 45:21–46:10; 46:24–48:5.

Mr. Kunzmann's sworn statements and the Debtor's representations to the Court in the Customer Programs Motion are buttressed by three affidavits in support of Defendant's motion for summary judgment, (i) an affidavit by Robert Desio, PCD's former National Service Manager, (ii) an affidavit by Todd Mazza, PCD's former Vice President of Sales to Verizon, and (iii) an affidavit by Darin Michal, KMT's principal.

Messrs. Desio and Mazza acknowledge that the Repair Service Vendors were critical to the Debtor's ability to honor its warranty claims and to refurbish phones returned out of warranty and that the loss of the Repair Service Vendors would have caused severe disruption to the Debtors' business.  *Dessio Aff.* ¶¶ 6–7; *Mazza Aff.* ¶¶ 12–13.  They explain that it would have taken the Debtor many months to locate, engage and train another vendor to perform the Warranty Repairs and Out of-Warranty Repairs. *Desio Aff.* ¶ 9; *Mazza Aff.* ¶ 14.  It also would have been impossible for Shine to perform the Warranty Repairs or Out-of-Warranty Repairs being performed by KMT for Verizon. *Mazza Aff.* ¶ 16; *Desio Aff.* ¶ 10.

---

[10] Query whether this would have been an administrative claim?

21

Mr. Mickel confirmed that KMT was not a large enough business that it could sustain any significant non-payment by PCD and that, if PCD failed to pay KMT the amount owed as of the Petition Date, KMT would have suspended or terminated its relationship with PCD.  *Mickel Aff.* ¶ 6.  Moreover, had the Debtor advised KMT, who did not have an attorney involved in this case at that time, that it would be subject to liability for voidable preferential transfers, notwithstanding the Court's approval of the Customer Programs Motion, KMT would have refused to perform further services to the Debtor. Id.

Like the bankruptcy court in AFA, 538 B.R. at 244, which distinguished Zenith and found, based upon the specific facts in that case, that "the inclusion of the alleged preference payment in the [critical vendor] motion would not have been likely to draw an objection or result in the Court's refusal to enter the Order,"[11] this Court should find that, if the alleged preference payments to the Repair Service Vendors had been included in the Customer Programs Motion, no one would have objected and the Court would have approved the motion. The record on this issue is undisputed.

## POINT II

### PLAINTIFF CANNOT SATISFY § 547(b)(5) BECAUSE A CHAPTER 7 TRUSTEE WOULD HAVE PAID KMT IN FULL, AS A CRITICAL VENDOR, IN ORDER TO CONSUMMATE THE SALE WITH QUALITY ONE

For a payment to be avoidable as a preferential transfer, five (5) elements under § 547(b)

---

[11] In AFA, the alleged preference was $24,000 and the court characterized this as "a mere fraction of the critical vendor cap" of $6,000,000.  Id. at 244.  Notably, in AFA, paragraph "2" of the critical vendor order contained similar, discretionary type language found in the Interim Order and Final Order, whereby "[t]he Debtors are authorized, but not required, to pay, in their sole discretion…Essential Supplier Claims in an aggregate amount not to exceed $6 million…"  However, the language in paragraph "2" was even more discretionary, as it went on to state in the next sentence: "Nothing in this paragraph shall be construed as requiring the Debtors to make a payment to a particular creditor or claimant."  Significantly, the AFA court did not find that this discretionary language undercut the critical vendor defense.

589857v.2

must be satisfied. In re Roblin Indus., Inc., 78 F.3d 30, 34 (2d Cir. 1996). If any one element cannot be satisfied, the transfer cannot be avoided as a preference. See In re Waring, 491 B.R. 324, 330–32 (Bankr. E.D.N.Y. 2013). In the present case, Plaintiff cannot satisfy the fifth element, subsection 547(b)(5), by showing that KMT received more on account of the challenged transfers than KMT would have received in a hypothetical chapter 7 liquidation. See 11 U.S.C. § 547(b)(5).  In a chapter 7 liquidation, a trustee of PCD would have operated the Debtor's business, under § 721 of the Bankruptcy Code, in order to consummate the sale of assets to Quality One and KMT would, undoubtedly, have received payment in full, as a critical vendor, of any amount owed prepetition.

"Section 721 of the Code[12] allows bankruptcy courts to authorize a chapter 7 trustee to operate the debtor's business for a limited period of time, if operation of the business is in the best interest of the estate and consistent with an orderly liquidation." In re Kiwi Int'l Air Lines, Inc., 344 F.3d 311, 319 (3d Cir. 2003) (citing 11 U.S.C. § 721).

On many occasions, both in this circuit and others, chapter 7 trustees have operated a debtor's business, pursuant to § 721 of the Bankruptcy Code.  See In re Sofer, 519 B.R. 28, 32 (Bankr. E.D.N.Y. 2014); In re Middle Bay Golfers' Ass'n, Inc., No. 8-13-70361-DTE, 2013 WL 6355598 (Bankr. E.D.N.Y. Dec. 5, 2013); In re TransCare Corp, 552 B.R. 69 (Bankr. S.D.N.Y. 2016); In re Ampal-Am. Israel Corp., No. 12-13689 (SMB), 2015 WL 5176395 (Bankr. S.D.N.Y. Sept. 2, 2015), aff'd, No. 15-CV-7949 (JSR), 2016 WL 859352 (S.D.N.Y. Feb. 28, 2016), aff'd, 677 F. App'x 5 (2d Cir. 2017); In re Middle Bay Golfers' Ass'n, Inc., No. 8-13-

---

[12] The statute provides:

> The court may authorize the trustee to operate the business of the debtor for a limited
> period, if such operation is in the best interest of the estate and consistent with the orderly
> liquidation of the estate.

11 U.S.C § 721.

23

70361-DTE, 2013 WL 6355598 (Bankr. E.D.N.Y. Dec. 5, 2013); In re Siskin, No. 02-10373 SMB, 2011 WL 4899868 (Bankr. S.D.N.Y. Oct. 13, 2011), aff'd, No. 11 CIV. 9468 NRB, 2012 WL 2367043 (S.D.N.Y. June 20, 2012); In re Premier Golf Properties, LP, 564 B.R. 710 (Bankr. S.D. Cal. 2016); In re Gwen, No. 15-02111 JAK, (C.D. Ca. Nov. 5, 2015); In re Spearman Food Distributors, Inc., No. 10-10409 MR, 2011 WL 4595274 (W.D. N.C. Sept. 30, 2011); In re Aloha Airlines, Inc., No. 08-00337 LK, 2008 WL 5758797 (Bankr. D. Haw. Nov. 26, 2008); In re Quarter Moon Livestock Co., 116 B.R. 775 (Bankr. D. Idaho 1990); see also 3-721 Collier Bankruptcy Manual ¶ 721.02 ("Courts may authorize the chapter 7 trustee to operate the debtor's business on an interim basis where doing so will maximize the value of the estate and thus increase creditor recoveries.").

Authority for a chapter 7 trustee to operate a business is appropriate "where it appears that a business could be sold for a greater price as a going concern than would be obtained in ordinary liquidation." In re A&T Trailer, Inc., 53 B.R. 144, 147 (Bankr. D.Wyo. 1985); see In re Lason, Inc., 300 B.R. 227, 233 (Bankr. D. Del. 2003) ("[A] chapter 7 liquidating may be done … as a going concern.").

In the present case, a chapter 7 trustee would, undoubtedly, have filed a motion to operate the Debtor's business, pursuant to § 721 of the Bankruptcy Code, in order to consummate the sale of substantially all of the Debtor's assets to Quality One. Notably, Quality One entered into the APA immediately prior to the Debtor's filing for bankruptcy protection, and the sale closed within two months of the petition. Section 721 of the Bankruptcy Code could have easily provided a chapter 7 trustee with authorization to operate the Debtor's business for two months in order to consummate a sale of substantially all of the Debtor's assets.

A chapter 7 trustee would have had a tremendous incentive to operate the Debtor's business, so as to preserve its enterprise value, because the alternative to a sale of the Debtor's business as a going concern "would be an auction of the inventory of phones [the Debtor] had left. That's basically it." *Kunzmann Dep. 54:24–55:12.* While the APA was worth about $200,000,000 to the Debtor's estate, a sale of the Debtor's phone inventory would be worth much less, at most 50% of book value. Id. at 54:22–55:23.

Moreover, to effectuate the sale with Quality One, the chapter 7 trustee would have had to file a motion substantially similar to the Customer Programs Motion, because it was essential for the Repair Service Vendors to render services to the estate post-petition. In such event, KMT would have been paid 100% of all amounts owed prepetition, including the preference payments had they not been made.

Accordingly, Plaintiff cannot meet its burden of satisfying § 547(b)(5).

## CONCLUSION

In accordance with the foregoing, Defendant's motion for summary judgment dismissing the Complaint should be granted.

Dated: New York, New York
           August 30, 2017

                              DAVIDOFF HUTCHER & CITRON LLP

                              By: /s/ David H. Wander
                                      David H. Wander, Esq.
                              605 Third Avenue
                              New York, New York 10158
                              (212) 557-7200

Of Counsel
David H. Wander, Esq.
Taylor D. Kopelan, Esq.